Estate of de Laveaga was before the supreme court in 119 Cal. 651, 51 Pac. 1074; 142 Cal. 158, 75 Pac. 790.

---

## IN THE MATTER OF THE ESTATE OF JOSE VICENTE DE LAVEAGA, DECEASED.

[No. 15,120; decided December 6, 1899.]

**Legitimation of Child.—Plenary Proof of Paternity** is required under the code provisions for the legitimation of illegitimate children.

**Legitimation of Child—Liberal Construction of Code.—**The statutory provisions for the legitimation of illegitimate children are to be construed liberally, but liberal construction does not mean the frittering away of the written law.

**Legitimation of Child—Acknowledgment by Parent.**—Admissions of paternity are not equivalent in legal effect to the acknowledgment of the child as the parent's own; mere admissions of paternity by the father are evidence of paternity, but by themselves are not evidence of acknowledgment. By acknowledgment is meant that the father must acknowledge the child as if it were his own legitimate offspring; and his acts and declarations to establish this must be open and not secret; that is, they must have the ordinary and usual publicity attendant upon a legitimate relation and status.

**Legitimation of Child.**—When the Status of Legitimacy is once attained by an illegitimate child, it cannot thereafter be affected by acts of the father in failing to name her in his will, or otherwise.

**Legitimation of Child—Consent of Mother.**—While under the code it is not necessary that the consent of the mother, that is her affirmative agreement, be given before the legitimation of a child can be effected by the father, yet if the mother successfully prevents the father from exercising paternal authority over the child, and he does not perform the acts required of him under the law, no legitimation takes place.

**Legitimation of Child.**—The Mother of an Illegitimate Child is entitled to its custody under section 200 of the Civil Code, but after its adoption or legitimation by the father under section 230, he is entitled, under section 197, to all the rights that he has over a legitimate child. But before he can assert his rights under section 197, and deprive her of hers under section 200, the child must be made legitimate under section 230.

**Legitimation of Child—Acts and Intention of Father.**—For a father to legitimate or adopt his child under section 230 of the Civil Code, he must perform all the acts required by the statute; his intentions and plans, if not carried out, are not sufficient.

**Legitimation of Child.**—The Evidence in This Case fails to show an acknowledgment by the father, or a reception into his family, of his alleged illegitimate child.

Case of Dolores de Rivera, claiming to be Dolores Apolonia de Laveaga, daughter of Jose Maria de Laveaga, deceased, an heir to Jose Vicente de Laveaga, deceased.

Graves & Graves, W. L. Pierce and W. S. Wood, for the claimant.

COFFEY, J.   The trial of the case of the claimant Anselmo was far advanced, for about two months in actual operation, when there intervened the claimant Dolores Apolonia de Rivera. Her petition was filed November 29, 1898, nearly

two years after the petition of Anselmo, which was filed January 11, 1897, and follows the same form in the presentation of her case. She claims to have been born in 1872 of one Jesus Bustillos, by Jose Maria de Laveaga.

The principal witness in support of this claim is one Felizardo Flores, who testified to an acquaintance with the late Jose Maria de Laveaga begun at the house of Jesus Bustillos, which ripened into intimacy so that witness used to accompany Jose Maria to places of amusement and sometimes to his room; witness could not say that they were friends, but occasionally Jose Maria communicated things to him; Jose Maria worked in the mercantile house of T. Lemmen Meyer, and Flores was engaged in various small occupations; they came together mostly in the evenings in the house of Jesus Bustillos, met there Antonita, Carmelita, Josefa, and other members of the family; Francisco Montijo was there, also, and their mother; Flores saw Miguel de Laveaga at the house of Mrs. Bustillos at least once, when he was introduced to him, then and there; he saw him there afterward several times; in the year 1870 and he believed also in 1871 and 1872. Flores used to see Jose Maria there frequently; the witness did not account himself exactly as the friend of Jose Maria because the latter was on a plane superior to him socially as he considered. Flores had known Dolores Apolonia de Rivera since she was born; before her marriage she called herself Lolita Laveaga; the witness was there when the woman was confined, but he did not remember that he was there at the moment of the birth, which took place in 1872, during the daytime; Flores happened to go there during the woman's sickness and saw Jose Maria, who sent him to get a woman to assist her, telling him to stay there to be of service; the witness obtained the assistance of Mrs. Maria Morales, who lived on Commercial street near the wharf; she came immediately with him and waited on the woman; after the birth of the child he went to the counting house of Lemmen Meyer and told Jose Maria that a little girl (niña) was born; Flores wished him joy and he seemed pleased and told him to go back to the house and remain there to be of service; Jose Maria came to the house in the afternoon and took up the child and they took a drink to

the health of the child; in the evening some friends assembled and they had a few drinks and congratulated Jose Maria; he accepted the congratulations with thanks. There were present the witness, the midwife, the woman whom he brought there, Maria Morales, Josefa Montijo, the mother of the child, Carmelita, whose other name he could not remember, Antonia, and Jose Maria de Laveaga. The witness saw him the next day at night in the house of Jesus Bustillos; the family were present but he did not remember the other persons present; Jose Maria was there present. At that time the midwife brought in the child and placed it in the arms of Jose Maria and told him that the child had the features of the family, of the family of de Laveaga; he accepted that statement, and said that when the child would grow older she would still more resemble the family and grow handsomer as she grew older; the witness did not remember the rest of the conversation; he had subsequent conversation with Jose Maria on the subject of his relations with the mother of the child; they drank toasts to the child, and Jose Maria said that he hoped that the child would be spared, that she would grow up and be happy; he hoped that God would spare the child to make her happy; "May God save my daughter (mi hija) to grow up and be happy"; the witness did not remember any more of that conversation; he had conversation with Jose Maria at various times about the mother of the child; he said that the mother sent a message to him and he felt worried because he felt the child might suffer and be unhappy, but if it should so turn out it would be the mother's fault; Flores was present once in Jose Maria's room when the latter received a letter which he showed to him and he only glanced at it, and Jose Maria said she is sending for money and he hoped that she would get tired of the child and that he would get her; he hoped that Jesus, the mother of the child, would tire of the child and give it to him; the witness had conversations with him on this topic many times; there were others present at some of these conversations, Josefita, Antonia, and other members of the family; she told him to "go to the devil with his money, she wanted her daughter." Flores was present in Concord, Contra Costa county, when a letter was received from Jose Maria by Jesus, this was in 1873; he told Flores

in this letter that he wanted him to look out for the child and reminded him of the times they had in the past when Flores was in the Bustillos family, "mi niña"; Jose Maria asked when they would come back; in their conversations Jose Maria told him that he was the father of the child, many times he told him that she was his daughter; Jose Maria had a latchkey to the house of Jesus both before and after the birth of the child; many a time the witness accompanied him to the house and left him there; he came and went as he pleased; he would go in and lie down and leave at his pleasure; Flores had seen him asleep many times with Jesus Bustillos before and after the birth of the child; he had gone to that house and with Jose Maria and found the sister of Jesus in bed with her, and the sister would arise and go into another room and Jose Maria would go into the same bed with Jesus and remain there. Dolores Apolonia, "Lolita," was baptized in St. Francis Church, Vallejo street, in 1872; the witness was not present in the church, he was in the house with other persons upon the return of the party from the ceremony at the church; the family were in the house and other persons, Nicholas Den, Otto Frank, and others; Flores did not remember whether the priest was present; there was also Mariano Avila, but he recalled no one else; they took several drinks to the health of the child; they called the child "Dolores"; Jose Maria told the witness it was a family name; he told him that the sponsors were Josefa Montijo and her son Francisco; Jose Maria said that he wanted the child so that he might educate her in the position of his family; Flores remembered that there were some marks on the countenance of Jose Maria, he was shortsighted and wore glasses; he had a mole on his face on the side but could not remember the side; it was red, "colorado"; he could not remember whether it was "colorado claro o' oscuro," as it was a great deal of trouble for his head to remember these details after so many years.

In their opening argument the counsel for Dolores based their case upon the Statute of 1870, section 9, which reads as follows:

"Sec. 9. Either or both parents of an illegitimate child, or the father, with the consent of his wife, or the mother,

with the consent of her husband, may acknowledge such child as his or their own by a document in writing, executed by either, if single, or both if married, or by treating, receiving or acknowledging him publicly as his or their own legitimate child; and such child, and the one mentioned in the foregoing section, shall, to all intents and purposes, be deemed legitimate from the time of its birth, and entitled to all the rights and privileges of legitimate offsprings.''

Section 3 of this act provided that an illegitimate child could not be adopted without the consent of its mother, and that the consent of a minor, if over twelve years of age, should always be necessary.

This statute continued in force until January 1, 1873, when the Civil Code took effect. Chapter 2 of the Civil Code provides generally for the adoption of minor children in much the same terms as in the statute of 1869-70: Civ. Code, secs. 221-230.

The Civil Code, section 230, provides:

''The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such; and such child is thereupon deemed for all purposes legitimate from the time of its birth. The foregoing provisions of this chapter do not apply to such an adoption.''

In the closing argument of counsel, however, they insisted that they had made out their case under both the statute of 1870 and the Civil Code section above quoted; saying that if Jose Maria de Laveaga had no family the portion of the section last above quoted from the Civil Code relating to the receiving into his family is foreign to this case and that collateral kindred do not constitute ''his family'' within the meaning of the statute: Blythe v. Ayres, 96 Cal. 578, 579, 580, 31 Pac. 915, 19 L. R. A. 40.

Counsel argue that the acts of the father fulfilled the measure of both the earlier statute and the present code, and with feet firmly planted upon these two pedestals they stand sure of success. As to the strictness with which the first quoted statutory provision is to be construed, the supreme court has said, ''that the cases are clearly to the effect that

the section, being in derogation of the common law, must be strictly construed. So far as the cases relate to the degree of proof required to establish the parentage of the child, or that the claimant is the illegitimate child of the alleged father the rule is clear, under both the old and the new law."

If the paternity of a child be the matter in dispute, strict proof of the fact should be required, but once the paternity is established, the statute should be liberally construed so far as it affects the question of legitimizing the child under the Civil Code, section 230, hereinabove quoted. Such is the code canon of construction.

"Sec. 4. The rule of the common law, that statutes in derogation thereof are to be strictly construed, has no application to this code. The code establishes the law of this state respecting the subjects to which it relates, and its provisions and all proceedings under it are to be liberally construed, with a view to effect its objects and to promote justice": Civ. Code.

The earlier statutes requiring a written acknowledgment were strictly construed. This was followed by more liberal statutes, authorizing the legitimizing of this class of children, which clearly indicates that such construction was not consistent with the objects and purposes of such legislation: 81 Cal. 443, 21 Pac. 976, 22 Pac. 742, 1028, 6 L. R. A. 594. But liberal construction does not require or authorize the frittering away of the written law: Estate of Jessup, 81 Cal. 423, 21 Pac. 976, 22 Pac. 742, 1028, 6 L. R. A. 594.

Acting upon these rules of interpretation and construction, the inquiry is, (1) Whether this child has been proved illegitimate; (2) Whether Jose Maria de Laveaga has been proved her father; and (3) Whether the acts and declarations of the deceased amounted to a public acknowledgment by him of this child as his own, receiving it as such into his family, and otherwise treating it as if it were a legitimate child: 81 Cal. 424, 21 Pac. 976, 22 Pac. 742, 1028, 6 L. R. A. 594.

We assume for the purposes of this opinion that the illegitimacy was sufficiently established, although the mother of the child was at the time of the latter's birth the legal wife undivorced of one Emeterio Ortiz, to whom she was married in or about the year 1869, but from whom she had been for some time separated, the story of which marriage and separation is

told with sufficient succinctness by Rafael Bustillos, her brother, who testifies that he came here in 1862; his sister Jesus Bustillos was married to Emeterio Ortiz in 1869, the same year that he was married; after a while Ortiz gave her a divorce in his own hand, the witness saw the paper, but all he could recollect was that it gave her her liberty, just the same as if it were done in court; this happened in the year of their marriage; Ortiz went from here to Alamos in the state of Sonora; the witness stated he had a poor memory but remembered the date of the year, 1869, because it was the same year of his own marriage; Jesus was married a month or two before that event; Jesus had a child about the same time that his wife had a boy, "Charley," who was living and in court during the trial; his first child was a girl born about the same time as the first child of Jesus; Charley was about twenty-eight or twenty-nine years old at the time of the taking of the testimony, December 20, 1898; he was born in 1872; Bustillos first saw the late Jose Maria de Laveaga before his marriage; he was a good friend of the witness in the first place and had great confidence in him; he became godfather of the first child of the witness, the little girl that died; after that they were compadres; Jose Maria had some agreement with his sister Jesus, some private business of their own; Jose Maria was the supporter of that house, he was the one to come to the front on all occasions; he supported the house, supported Jesus and his child, that is, Dolores, they were living together as husband and wife; he had another room elsewhere; his other room was on Stockton street; Dolores was born in 1872; before the birth the witness noticed that his sister Jesus was in the family way; he did not talk to Jose Maria at that time about it, but afterward he had conversations with him; he said that the child was his girl, that he recognized it and that everybody knew it, but that Jesus was annoying him about the child; he was then working for a living; the witness spoke to Jose Maria on the subject of marriage, in the beginning of 1873 or the last of 1872, in the latter's room one evening, and asked him why he did not settle down and get married; he said, "You mean Jesus," and the witness rejoined, "No, not particularly"; but why should he go around manufacturing a child in every house instead

of settling down and having his wife and family about him; Jose Maria said he did not care to do so, but that he wished to God that his little girl would grow up and they would see that he would do for her, that he recognized her and would show what he would do; before Jose Maria went away finally they had a walk and talk together, and he told the witness he was going away to look out for himself, to seek his individual fortune, as he had no home here and would go elsewhere to better himself; Jose Maria asked the witness to take care of the little girl and if he had luck he would reward him for it, and Bustillos promised that he would do so and kept his promise until the little girl grew old enough to go to work; when she became old enough to work for herself it was not necessary for him to do so; the witness was working as a marble cutter and earning three dollars and a half and four dollars a day and was steadily engaged at the time of this conversation; his average wages were three dollars a day; he began to work with Leon R. Myers & Co., and worked there for fifteen years, and also worked for others afterward. He sometimes received two and a half dollars a day, sometimes three and four dollars a day and when employed on Sundays five dollars. a day; his average earnings after serving his time for four years were three dollars; the witness had earned eleven dollars a day making door plates, marble door plates, cutting and engraving plates and names thereon; this was special work of his own outside of his regular employment; Bustillos assisted Dolores, the child, from the time he promised Jose Maria until she grew old enough to work; Jose Maria told the witness at that time that he was in poor circumstances and was going away to try and recover himself, to retrieve his fortunes; that he had no family, that he was put out of home, and had no one to depend on but himself, and that he was going to look out for his individual, "to look out for number one"; that is what he said in substance; Jose Maria asked the witness to look out for the child and he would reimburse him when he made some money; he informed the witness that Jesus was never well after the birth of the child and he was afraid she would die and leave the child among strangers; Bustillos remembered that upon one occasion in Jessie street where he lived, Jose Maria, Jesus, and the child visited his

wife, himself, and his sister in law Eloisa Cabrera being present, and he compared the girl with the boy "Charley," and he said that she was handsomer than the boy of witness; a man named Cima was present also; on one occasion Jose Maria gave Bustillos an envelope with sixty dollars in it all in five dollar pieces, envelope marked with her name; at another he gave him twenty-five dollars for her. Jesus went to Mexico on account of her health; at the time of the birth of this babe she caught cold and having no proper care it developed into consumption and she had to go away and she died in Guaymas in 1880 or 1881; Jose Maria told the witness the name Dolores was given to the child because it was the name of Jose Maria's mother; Dolores was the name of the father of the witness; in the year 1873 on the steamer going to Oakland Bustillos saw Jose Vicente speak to his sister Jesus, who had the child with her, and Vicente took the child up and patted it on the arm and spoke some words to Jesus, who replied to him through a pipe or ear trumpet, as he was very deaf. Bustillos did not attend the funeral of Jose Maria, but went to the church in the basement of Nuestra Senora de Guadalupe on Broadway with his sister Jesus and the child "Lolita"; this was in 1880; but he could not swear to the exact date. The name of the father of witness was Dolores Bustillos, his mother was Josefa Montijo de Bustillos; they had six children: Francisco, Josefa, Manuel, Maria, Rafael, Jesus; three boys and three girls; Manuel was a marble cutter and that also was the trade of witness; both worked for Myers; Bustillos lived in his mother's house prior to his marriage and after the death of his wife he returned to the same house; that is, he went back to live with his mother; upon his marriage he went with his wife to keep house and after her death he returned to reside with his mother and continued to live with her until he left for Los Angeles in 1880. Bustillos had seen Ortiz before his marriage to his sister Jesus but had no acquaintance with him; Ortiz was married at the house by a priest; they lived only two months together when she refused longer to live with him; Jesus told the witness that she did not want to have anything more to do with her husband; he never knew Ortiz to do any work; the witness first learned that his sister Jesus and Jose Maria

were intimate in 1871 and 1872; the first information he had of that fact was from Jesus herself in 1871 or 1872, that was before the baby was born, say six or seven months; he never complained to Jose Maria about his intimacy with his sister; his sister Josefa worked for a man named Shreyer on Washington street, he thought; there was an old man named O. H. Frank living at his mother's house; his sister Jesus told him of Jose Maria's intercourse after he knew all about it already; he never complained to anybody about it, as it was none of his business; the witness did not want to interfere with her business; Bustillos saw the paper Ortiz gave to his sister which he said was a divorce, as good as any a court could give; it gave her liberty to do as she pleased. Bustillos left here in 1880. When he left San Francisco his mother was living on Vallejo street, south side, between Broadway and Mason streets; they had lived at several other places prior to that; Jesus went from here to Guaymas where she died, the witness was living at San Francisco at the time they heard of her death; it was after that he went to Los Angeles; his son Charles was born in 1872, Florencio in 1874; Bustillos married a second time in 1883 or 1885 in Los Angeles.

Assuming, then, illegitimacy established, was Jose Maria de Laveaga the father of this Dolores? Did he publicly acknowledge her as his child? In answer to the argument that he never assumed the corporal charge of the child, her counsel point to the section of the code which bestows upon the mother of an illegitimate unmarried minor the right to its custody, services and earnings: Civ. Code, sec. 200.

Counsel for this claimant consider that one of the chief questions in this case was the character of Jose Maria de Laveaga, whom he regarded as a libertine, who notwithstanding his education and accomplishments and the polish coming of foreign travel and continental culture was not guided by any principle of rectitude or conscience and was simply in the servitude of his sensuality, who had no high standard of ethics, no elevated code of honor in his dealings with women, and so comes this child, an innocent, refined girl, to whom justice is due and who should receive the favorable judgment of

the court, upon the proofs produced of her illegitimacy, paternity, acknowledgment, and legitimation.

Counsel say that at the beginning of this case of Dolores stands out one incontrovertible fact: The baptism of Dolores Apolonia as recorded in the register of baptisms of St. Francis Church in Vallejo street, produced and proved by its present custodian, the Reverend John Valentini. It contains these entries:

| 1. Date. | 2. Name Child | 3. Lawful Child. of | 4 Born. | 5. Sponsors. | 6. Priest. |
|---|---|---|---|---|---|
| A. D. June 7, 1872. | Dolores Apolonia de- Laveaga. | Jose M. de- Laveaga Jesus Bustillos. | 10 April 1872. | Francisco Bustillos Josefa Montijo. | John Valen- tini, Assistant. |

Counsel say this is a most material fact, standing out in bold relief; it shows that in June, 1872, there was recorded in one of the Catholic churches of this city a notation of the birth of Dolores Apolonia de Laveaga, lawful child of Jose M. de Laveaga and Jesus Bustillos, born on the 10th of April, 1872, and baptized on the 7th of June, in that year, the sponsors being Francisco Bustillos and Josefa Montijo, and the priest officiating being the witness Father Valentini; a record of a religious rite of the utmost solemnity by a sacred functionary of the most exalted character; a record entitled to the highest credence: 1 Greenleaf on Evidence, sec. 115; Kennedy v. Doyle, 10 Allen (Mass.), 161; Taylor on Evidence, sec. 633.

That when Jose Maria once publicly said ''this is my child'' he forever established its status; no subsequent neglect by the deceased could forfeit that right so acquired; it was fixed irrevocably: Estate of Jessup, 81 Cal. 425, 21 Pac. 976, 22 Pac. 742, 1028, 6 L. R. A. 594.

Counsel for Dolores say that the only point of difficulty in this case is that the deceased made the declaration in his will and in the actum that the boy was his only child, but such declaration and his alleged statements to Miguel de Laveaga, and to the witness Hazard are self-serving, incompetent, and inadmissible as evidence tending to deny the paternity of the girl: Gillett on Indirect and Collateral Evidence, secs. 142, 230; Greenleaf on Evidence, 13th ed., secs. 147-149; Montgomery v. Montgomery, 3 Barb. Ch. 132.

The character of the mother, Jesus Bustillos, is immaterial; no matter what she was, say the counsel, Jose Maria was the father of the child Dolores, the girl claimant, and every element of the statute and code has been established entitling her to recover as his child and heir.

Counsel for this claimant set great store by the baptismal record; but its importance as evidence is exaggerated. The baptismal entry is evidence only of the fact and date of baptism. It is no farther competent than to establish such fact. This rule has been laid down in precise terms by the supreme court of the United States in the case of Blackburn v. Crawfords, 3 Wall. (U. S.) 175, 18 L. ed. 186, as follows:

"The question is as to the entry in the baptismal register of St. Patrick's Church. The plaintiff in error objected to it as inadmissible for any purpose. If admitted, he contended that it was competent to prove but the fact and date of the baptism. The court overruled both objections, and admitted the entry as evidence, as well of the fact and date of the baptism, as of the fact that the child was baptized "as the lawful child of Thomas B. Crawford and Elizabeth Taylor, his wife."

"The register was admissible upon the ground that the entries in it were made by the writer in the ordinary course of his business.

"How far such an entry is evidence is a different question. Upon that subject, Starkie thus lays down the rule: "An entry of the time of a child's birth, although contained in a public register, is not evidence as to the time of the birth, unless it can be proved that the entry was made by direction of the father or mother; and this seems to be received as a declaration made by one of them—for a clergyman has no authority to make an entry as to the time of the birth, and possesses no means for making any inquiries as to the fact." Greenleaf says: "It is to be remembered that they are not generally evidence of any fact not required to be recorded in them, and which did not occur in the presence of the registering officer. Thus a parish register is evidence only of the time of a marriage, and of its celebration de facto, for these are the only facts necessarily within the knowledge of the party making the entry."

"Without further evidence, the court ought not to have admitted the entry in question for any purpose but to prove the baptism of the child, and the date of the administration of the rite. We think this proposition too clear to require discussion."

Jose Maria was not present at this baptism and had no hand in it at all by request or otherwise, as may be inferred from the fact that the sponsors were the mother and brother of Jesus Bustillos and there was present no one who could be considered as his representative, and he was near enough to be called in or consulted in advance as to whom he should select for the important office of sponsor.

It is plain that the matter was not foreknown to him or authorized by his act; at all events, no inference implicating him in the transaction follows from the certificate or its contents as evidence under the authority cited, the highest in the land.

It is claimed that the character of the mother is immaterial, provided paternity be proved; but it is material when it places that issue in doubt.

Jose Maria had a number of friends of his own sex and in his own sphere from whom he might have made a choice for godfather of the child, but it does not appear that he sought the services of any one male or female, unless we credit the evidence of Carmen Garcia, who says that Jose Maria told her he was going to call the child Dolores as it was a family name, whether that of his mother or sister Carmen did not recollect; this witness testified that two days after the child was born he came to see her and asked her to act as godmother, he said he wanted some responsible person to baptize the child and he desired the services of Carmen in that capacity; this lady refused because she was not well and could not act as the female sponsor. This Carmen Garcia belonged to what one of the counsel called the Bustillos environment, and is entitled to corresponding credit.

This name Dolores is not peculiar to the family of de Laveaga, and although frequently bestowed in baptism upon a female child is sometimes given to male children, and in that respect was no more a family name of Jose Maria's because his mother was so called than it was of Jesus Bustillos' family.

because her father was christened Dolores; the name was also borne by a sister in law of Jesus, a witness in this case, Dolores de Bustillos, widow of Francisco Bustillos, the male sponsor at the baptism of this claimant. Carmen says that Jose Maria made this request of her two days after the birth of the child, but about two months elapsed between birth and baptism; the child was born April 10, 1872, and baptized June 7, 1872.

With reference to the character of the mother of this claimant little need be said. At the time of the birth of this child Jesus was a married woman, with a husband living, separated but not divorced, with numerous admirers attracted by her charms, abiding in a house which, if not an abode of pleasure, was, according to the witnesses for this claimant, governed by no strict code of morals, and, if Flores is to be believed, access to the sleeping apartments of the ladies was easy. She had had already a child by Ortiz, her husband, and if this girl was not his offspring she was the fruit of adulterous intercourse in an atmosphere of immorality. Jesus Bustillos was not a simple maiden, the victim of a libertine, but a woman of experience, presumably able to protect her personal purity. In her case seduction is improbable. The evidence in favor of this claimant is furnished by declarations which are said to have been made by Jose Maria to ten witnesses, seven men and three women, fair samples of whose testimony have been herein given. Without criticising them in detail or further pointing out their defects of character and the contradictions and innate improbabilities of their narratives, nor their relationship to the family of claimant, and their interest in her case, it is only necessary to allude to the declarations to the contrary in proof by Jose Maria himself, which preclude the probability of his having admitted the paternity of this girl, most notably the will and the actum, which afford the strongest assurances and most authentic avowal of his own belief upon this point, utterly excluding the idea that this girl was his child.

Even if the testimony of the witnesses for claimant were all true and sufficient on the point of paternity, still its application to the question of acknowledgment would still remain to be made.

Was there public acknowledgment?

At most the declarations of Jose Maria testified to by the witnesses for this claimant amounted to an admission of paternity only, not an acknowledgment of the child as his own in the statutory sense; that is, not a recognition of her as a legitimate child, by which is not meant legitimate born, but legitimate from the fact of having been legitimated. Of course, admissions of paternity are not equivalent in legal effect to acknowledgment as one's own: 81 Cal. 457, 21 Pac. 976, 22 Pac. 743, 1628, 6 L. R. A. 594.

The father of the illegitimate must acknowledge him as if he were his own legitimate child, and in order that the proof may be made by disinterested parties, and fraud and imposition avoided, all the acts and declarations must be open and public and not secret. This does not mean necessarily public proclamation by the town crier, but it does require the ordinary and usual publicity attendant upon a legitimate relation and status. Counsel for this claimant dwells upon the decision of the supreme court that when the status of a claimant is fixed, it cannot be affected by subsequent acts of the deceased, by failing to name her in the will or otherwise, as by the exclusive declaration in favor of the boy in the will and actum in this case; but this decision of the supreme court was dependent upon the discharge by the alleged father of the duties which would have devolved upon him as the father of a legitimate child, namely, those of protection, maintenance, and education, and in that way treating her as his legitimate child: 81 Cal. 458, 21 Pac. 976, 22 Pac. 743, 1628, 6 L. R. A. 594.

It is shown in this case that Dolores never had the capacity of legitimation or adoption; that she never was in a position or situation where she could be legitimated or adopted, no matter what her alleged father's intentions or desires were. This is a most important point of law. It has been shown by her own witnesses that her alleged father never did as a fact for one moment exercise parental authority over this girl. There is absolutely no contradiction on that point; it is testified to by Flores, Montijo, Rafael Bustillos, Carmen Garcia, and Carillo. The mother of this girl absolutely refused to surrender the child. To counteract the obvious effect of this

proof counsel for claimant insist that the mother of an illegitimate child is entitled to its custody and that she, therefore, had the right to retain this claimant, but this argument is self-destructive and cannot apply to a legitimated child. If she were legitimated her father had the right to her custody (Civ. Code, sec. 197), but the burden of the statements made by the witnesses just named is in the language of Flores that the mother said to Jose Maria, that "he might go to the devil with his money, that she wanted her daughter and would keep her," and she did keep her, thus preventing the alleged father from taking the first step in the process of legitimation. It was not necessary that the consent of the mother of this illegitimate, that is her affirmative agreement to its adoption or legitimation by the father, should have been given before legitimation could take place (81 Cal. 420, 21 Pac. 976, 22 Pac. 743, 1628, 6 L. R. A. 594), but it was requisite before the father could assert his rights under section 197, Civil Code, and deprive the mother of hers, under section 200, Civil Code, that the child must have been made legitimate under section 230, Civil Code. All the acts of the father required by that section must have been performed. If the father was prevented from performing those acts, no matter how willing he was to perform them nor what was his intention in that behalf, if they were not performed they are not acts of the father, but merely his intentions that were never carried out, plans that were never executed, and, therefore, could not institute nor constitute a status. Jose Maria might many times repeat of the boy while the latter was in Mexico, "I have a boy in Mazatlan that was born of me by a servant girl in my father's house in San Francisco." That might be admission and proof of paternity, but neither acknowledgment nor public acknowledgment of the boy as his own, as if he were legitimate and taking him for legitimate. So of the girl claimant here. There was no taking her as his own as if she were legitimate, no elevating her from the degradation of a base-born child to the dignity of a legitimate daughter of the deceased. There is no evidence in this case of reception into the family, even in the most liberal interpretation of the statute. On the contrary the claimant's case is disproved by her own witnesses, for the result of their evidence is proof that there was

exercised no care nor control by deceased over the child; that he never assumed her custody; never made any provision for her education; never supported, nor did anything that responded to the requirements of what the supreme court decided devolved upon him as the father of a legitimated child. It is true that Rafael Bustillos testified that Jose Maria gave him sixty dollars all in five dollar pieces in an envelope with the name of Jesus marked upon it, and at another time twenty-five dollars for Jesus, but it does not appear that the money was given for the child, "as his own" or otherwise, or in any manner appropriated for the support or education of this girl; but, even if this testimony be accepted as true, these two isolated instances of contribution would not amount to an assertion of paternal obligation or duty, for it is sufficiently shown that he never exercised any parental right over the child; and unless all of these elements are established, claimant's case must fail, and it does fail upon each and every call of the code and every section of the statute.

The petition of Dolores is denied.

---

Estate of de Laveaga was before the supreme court in 119 Cal. 651, 51 Pac. 1074; 142 Cal. 158, 75 Pac. 790.